IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY MACHIOTE,

                                         OPINION AND ORDER

          Plaintiff,

                                           18-cv-249-bbc

    v.

DR. ROETHLISBERGER, DR. KUBER,
DR. HOFFMAN, CANDACE WARNER
and KIM STECKER,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Anthony Machiote, who is incarcerated at the New Lisbon Correctional Institution, is proceeding on Eighth Amendment claims that defendants Dr. Roethlisberger (who now goes by the last name Herweijer), Dr. Kuber, Dr. Hoffman, Candace Warner and Kim Stecker failed to provide him adequate pain medication following his orthoscopic ankle surgery. Now before the court is defendants' motion for summary judgment. Dkt. #33. For the reasons stated, I am granting defendants' motion for summary judgment and closing this case.

       From the parties' proposed findings of fact, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

       Plaintiff is incarcerated at the New Lisbon Correctional Institution, where defendants all worked at the time of the events at issue in this lawsuit. Dr. Roethlisberger, Dr. Kuber and Dr. Hoffman are physicians; defendant Candace Warner is the health services manager;

1

and defendant Kim Stecker is a nurse.

On September 26, 2017, plaintiff had ankle surgery. Upon his return to the prison that day, defendant Stecker called the on-call doctor, defendant Dr. Roethlisberger, to review plaintiff's discharge instructions. The offsite provider at the hospital recommended that plaintiff take one to two hydrocodone-acetaminophen tablets every six hours as needed for moderate pain. However, Dr. Roethlisberger ordered one to two tablets of Tylenol no. 3 (which contains the narcotic pain reliever codeine) every six hours as needed for a period of three days. She prescribed the alternative pain medication based on her medical judgment that it would adequately treat plaintiff's post-surgery pain and because the medication was available at the prison for plaintiff to start taking immediately. Dr. Roethlisberger had no further involvement with plaintiff's medical care beyond this phone call and order.

At 8:00 p.m. on September 26, 2017, plaintiff refused pain medication because he had taken oxycodone at the hospital at 5:00 p.m. and was still under the effects of a nerve block. Nurse Stecker gave plaintiff Tylenol no. 3 at 9:35 p.m. She then left the prison and was not on-call the rest of that evening. (There is some dispute as to plaintiff's interaction with Stecker. Plaintiff avers that Stecker called him to the health services unit at around 9:30 p.m. that night and told him that he should take the pain medication at that time because another dose would not be made available to him until 6:00 a.m. the following morning. Defendants do not dispute plaintiff's averment directly, but point out that because plaintiff's medication order at that time was for every six hours as needed, he could have requested another dose of Tylenol no. 3 beginning at 3:35 a.m. According to defendant

2

Warner, the correct procedure for doing so would have been for plaintiff to contact a security staff member, who would contact the on-call nurse to come to the institution to give plaintiff his medication per the doctor's order. Plaintiff says that he did not request any pain medication during the middle of the night, even though he was in excruciating pain, because Stecker had told him that he could not do so.) When Stecker returned to work the next morning, she gave plaintiff another dose of Tylenol no. 3 at 6:20 a.m.

At about 12:40 p.m. on September 27, 2017, plaintiff went to the health services unit to get a dose of Tylenol no. 3. Stecker told plaintiff that he had to get his medicine during regular medication pass times, like the other inmates. When plaintiff told Stecker that he was coming in every six hours per the hospital's orders, Stecker told him, "We will see about that." Stecker then gave plaintiff his medication.

At some point on September 27, 2017, Jacqueline Bogseth (whom I presume is a friend or relative of plaintiff) called the health services unit and spoke with Stecker about plaintiff's having been left in pain overnight and unable to sleep. Stecker told Bogseth that there would be no changes to the medication. The same day, Kristen Joseph (another friend or relative of plaintiff) called Nurse Warner to inform her that plaintiff was complaining that he was in pain and not getting his medication every six hours. Warner told Joseph that plaintiff's medication orders had been changed to four times daily and that plaintiff had received a dose at 1:00 p.m. that day. Warner also told Joseph that at the time of her call, plaintiff was laughing while he sat in a wheelchair in the waiting room of the health services unit. Warner then spoke with plaintiff to reiterate the importance of elevating his foot and

3

icing it to prevent swelling and pain. Plaintiff said that he understood.

According to plaintiff, while he was in the health services unit waiting room on September 27, he observed nurses Warner and Stecker having a heated conversation, which he assumed related to the phone calls they had received about plaintiff's being in pain. Another inmate made plaintiff laugh, for which Warner admonished him and became angry when he "did not show that he was receptive of the admonishment." After speaking further with Stecker, Warner returned to tell plaintiff that he would be receiving his medications at the regular medication pass times. Plaintiff expressed concern that he would have to go almost 11 hours overnight without pain medication, but Warner responded that this is "how it will go."

Defendant Dr. Kuber was the on-call physician who approved the medication change for plaintiff at 1:05 p.m. on September 27. An unidentified nursing staff member had recommended that plaintiff receive his medication four times per day at the regular medication pass times of 6:00 a.m., noon, 4:00 p.m. and 8:00 p.m., rather than every six hours. Dr. Kuber approved the change based on her medical training and judgment that the revised order would adequately treat plaintiff's pain. Dr. Kuber reasoned that under either the previous or new order, plaintiff would receive the medication no more than four times daily. Stecker noted the revised order in plaintiff's chart and stated "Stop after PM dose on 9-29-27," based on her understanding that Dr. Kuber's September 27 order revised only the dosage times and not Roethlisberger's original order limiting the prescription to three days. Dr. Kuber had no further involvement in plaintiff's medical care.

4

On September 27, 2017, plaintiff received his medication at 6:20 a.m., 1:00 p.m. and at 7:00 or 8:00 p.m. Although plaintiff attempted to get a fourth dose of his pain medication at the 3:00 p.m. medication pass, Stecker refused to give it to him because it was too soon, telling him to come back at the evening medication pass. Plaintiff woke in extreme pain at 1:00 a.m. on September 28. Even though he took Exedrin, Naproxen and Tylenol and iced and elevated his foot, he remained in pain until he could take his narcotic medication the next morning. He had the same experience at 1:00 a.m. on September 29.

Plaintiff received the remainder of his medication at the four regular medication pass times through the afternoon dose on Friday, September 29, 2017, when his prescription expired. On September 30, plaintiff filed a health service request about being in pain and having a burning sensation in his ankle. (Although plaintiff says he submitted the request on September 29, the form shows that he dated it September 30. Dkt. #37-2 at 18.) Nurse Stecker examined plaintiff later that day and decided to continue his current treatment plan without checking with the on-call physician.

On Sunday, October 1, 2017, the first-shift sergeant (6:00 a.m. to 2:00 p.m.) telephoned the health services unit because plaintiff was complaining about unbearable pain and an inability to sleep. The nurse working that day (whom plaintiff says was Stecker) told the sergeant that plaintiff had to put in a "blue slip" for medical assistance, even though the form states that if an inmate is experiencing an emergency, he should contact staff. Plaintiff submitted a health service request that day but did not see a nurse until the following day.

On Monday, October 2, 2017, Nurse Warner listened to a voicemail message that plaintiff's friend or relative, Jacqueline Bogseth, had left her late on Friday, September 29, stating that plaintiff was complaining about foot pain and an inability to sleep. Warner returned Bogseth's call on October 2 and told her that plaintiff had been prescribed narcotics for only three days (ending on the afternoon of September 29), but that she would have a nurse see plaintiff that day. Plaintiff saw a nurse, who is not a defendant, at 1:00 p.m. on October 2 and complained about being in pain. The nurse called the on-call doctor, who is not a defendant, but no new orders were given. The nurse reiterated to plaintiff the importance of icing and elevation.

On October 3, 2017, defendant Dr. Hoffman reviewed plaintiff's chart and ordered a new prescription for Tramadol (a narcotic medication) every six hours as needed for pain. Plaintiff had existing prescriptions for other pain relievers (Naproxen, Excedrin and acetaminophen) at that time and began taking the Tramadol on October 5.

On October 4, 2017, plaintiff had a follow-up appointment with the surgeon, who noted that plaintiff did not have an infection and that he was "entirely pleased" with plaintiff's progress. Plaintiff also saw defendant Dr. Hoffman that day and complained about being in extreme pain and being unable to sleep. Plaintiff continued to see prison medical staff as he recovered and started physical therapy on October 31.

OPINION

A. Legal Standard

To prevail on a claim under the Eighth Amendment, a prisoner must show that the defendant was "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. Id. A medical need may be serious if it "significantly affects an individual's daily activities," Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the need by failing to take reasonable measures. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). In applying the deliberate indifference standard, "'[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.'" Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008)). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." Id. "A delay in treatment may constitute deliberate indifference if the delay

7

exacerbated the injury or unnecessarily prolonged an inmate's pain." McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010). How long the delay is tolerable "depends on the seriousness of the condition and the ease of providing treatment." Id.

The Court of Appeals for the Seventh Circuit has made it clear that at summary judgment, "[c]onclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." Powers v. Dole, 782 F.2d 689, 695 (7th Cir. 1986). Therefore, to prevail on his claims, plaintiff must present specific evidence showing that defendants did not have adequate medical justification for their treatment decisions. It is not enough for plaintiff to show that he disagrees with defendants' conclusions about the appropriate treatment, Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006), that other medical providers reached a different conclusion about what treatment to provide plaintiff, Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014), or even that defendants could have provided better treatment. Lee v. Young, 533 F.3d 505, 511-12 (7th Cir. 2008). Even a showing of negligence or medical malpractice is not enough to prevail on a claim under the Eighth Amendment. Norfleet, 439 F.3d at 396. Rather, plaintiff must show that any medical judgment by defendants was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles, 771 F.3d at 409. In addition, plaintiff must show how each of the defendants was personally involved in depriving or delaying plaintiff necessary treatment. Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012).

Plaintiff contends that defendants acted with deliberate indifference in failing to

insure that he received narcotic pain medication every six hours (particularly during the middle of the night) for more than three days following his ankle surgery, which resulted in his experiencing severe pain and an inability to sleep. Defendants do not dispute that they knew that plaintiff suffered from pain related to his ankle surgery, but they argue that he has failed to present sufficient evidence to show that any of them acted outside the bounds of accepted professional judgment, practice or standards. I will address plaintiff's claims against each defendant separately.

## B. The Physician Defendants

Plaintiff's claim against defendant Dr. Roethlisberger is based on her decision to prescribe Tylenol no. 3 (acetaminophen with another narcotic) instead of the acetaminophen with hydrocodone recommended by the hospital. However, the undisputed facts show that she based her decision on her medical judgment that Tylenol no. 3 would be equally effective for pain and immediately available for plaintiff to start taking. Although plaintiff contends that Dr. Roethlisberger should have ordered the alternate pain medication for longer than three days, medical staff have considerable discretion under the Eighth Amendment in choosing appropriate treatment, particularly with respect to pain medication, which requires medical staff to consider not just a patient's complaints of pain, but security and addiction concerns as well. Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) ("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . . Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from

judicial interference, except in the most extreme situations."). In this case, plaintiff has failed to adduce sufficient evidence to show that Dr. Roethlisberger's conduct in prescribing a narcotic for only three days was "blatantly inappropriate" or obviously unreasonable. Id. Roethlisberger had no reason to believe that plaintiff could not request additional pain medication if more was needed after three days. In fact, the undisputed facts show that alternative pain medications, including a narcotic, were made available to plaintiff after the Tylenol no. 3 prescription expired. Although plaintiff may not agree with Dr. Roethlisberger's treatment decision and may have hoped for a different medication or a longer course of medication, plaintiff's lay opinion to that effect is not enough to prove his claim that Dr. Roethlisberger acted with deliberate indifference to his pain. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010). Accordingly, defendant Dr. Roethlisberger is entitled to summary judgment.

Plaintiff contends that defendant Dr. Kuber acted with deliberate indifference in changing plaintiff's order for pain medication from every six hours to four scheduled times (6:00 a.m., 12:00 p.m., 4:00 p.m. and 8:00 p.m.), which left him without narcotic pain medication in the middle of the night. Again, the undisputed facts show that Dr. Kuber based her decision on her medical judgment that the revised schedule would allow plaintiff to receive his medication along with other inmates, while adequately treating his pain. Dr. Kuber also reasoned that plaintiff would receive his medication no more than four times a day under either order. Although I understand that plaintiff believes that Dr. Kuber's medical judgment "failed" and that she should have insured that he receive pain medication

every six hours, including during the middle of the night, he has failed to present any evidence other than his own lay opinion that the revised medication schedule fell outside the scope of accepted professional standards. There also is no evidence that Dr. Kuber knew her decision would mean that plaintiff would be in pain throughout the night, since plaintiff had access to other, non-narcotic pain medication. Without more proof of deliberate indifference to plaintiff's pain, a reasonable jury would not conclude that Dr. Kuber acted with deliberate indifference in adjusting the times at which plaintiff received his pain medication.

Plaintiff contends that as the supervisor of the health services unit (a fact that neither party proposed), defendant Dr. Hoffman should have ordered health services unit staff to follow a better schedule for medication delivery. However, there is no evidence that Hoffman was aware that plaintiff was in pain or that plaintiff's medication schedule was not working. Plaintiff was under the care of other physicians at that time and Dr. Hoffman was entitled to rely on their medical judgment. The undisputed facts show that Dr. Hoffman did not become personally involved in plaintiff's care until he saw plaintiff on October 3, 2017 and prescribed the narcotic Tramadol for pain. Although plaintiff criticizes Dr. Hoffman for not giving him Tylenol no. 3 immediately, he has not pointed to any evidence showing either that (1) Tylenol no. 3 was a more effective medication than Tramadol, or (2) Hoffman knew that plaintiff would not have access to Tramadol for another day and that plaintiff's pain was so severe that not giving him immediate access to a narcotic posed an excessive risk of harm by unnecessarily prolonging plaintiff's pain or exacerbating his injury. McGowan, 612 F.3d

at 640 (to support deliberate indifference claim, delay in treatment must exacerbate injury or unnecessarily prolong pain). See also Thomas v. Clay, 411 Fed. Appx. 908, 910 (7th Cir. 2011) (finding same in case in which plaintiff alleged defendant denied him pain medication or a doctor's appointment for 13 days). In fact, the undisputed facts show that plaintiff had access to non-narcotic pain medication at that time. Accordingly, defendant Hoffman is entitled to summary judgment with respect to plaintiff's claim against him.

## C. Defendant Warner

Plaintiff argues that defendant Nurse Warner acted with deliberate indifference by not reevaluating the revised medication schedule after he complained that it would leave him without pain medication overnight and after learning from third parties that he was in pain and unable to sleep during the night. However, plaintiff has not presented any evidence from which a reasonable jury could conclude that Warner had any authority to revise plaintiff's medication schedule. As discussed above, Dr. Kuber reviewed plaintiff's record and determined that it was appropriate for him to receive his medications during regular medication pass hours. Warner did not have any personal role in providing plaintiff treatment and was entitled to rely on Dr. Kuber's medical judgment. Although Warner had learned from plaintiff's friend, Kristen Joseph, earlier that day that plaintiff had been complaining about being in pain, plaintiff has not pointed to any evidence that Warner knew that Dr. Kuber's decision not to give plaintiff a narcotic overnight would pose an excessive risk of harm by unnecessarily prolonging plaintiff's pain or exacerbating his injury.

12

Berry, 604 F.3d at 443 ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."); Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances."). When Warner later learned from Jacqueline Bogseth and plaintiff that plaintiff had been experiencing severe pain overnight following the medication schedule change, she insured that plaintiff saw a nurse the same day. Accordingly, defendant Warner is entitled to summary judgment with respect to plaintiff's Eighth Amendment claim against her.

### D. Defendant Nurse Stecker

Plaintiff argues that Stecker prevented him from having pain medication during the early morning hours of September 27, 2017, by falsely telling him that if he refused to take a dose at 9:35 p.m., he would not be able to receive any medication until 6:00 a.m. the next morning. However, as with the other defendants, plaintiff has failed to point to any evidence from which a reasonable jury could conclude that Stecker knew that plaintiff's pain was so severe that denying him pain medication overnight posed an excessive risk of harm by unnecessarily prolonging his pain or exacerbating his injury. At most, Stecker's alleged false statement to plaintiff was negligent. Further, even if plaintiff believed that no additional pain medication would be made available overnight, he has failed to point to any

13

evidence that he would not have been provided with additional medical care if he requested it.

Plaintiff also contends that defendant Stecker acted with deliberate indifference by not doing anything to help plaintiff when she learned from Jacqueline Bogseth on September 27 that plaintiff had been unable to sleep the night before. However, the undisputed facts show that Dr. Kuber reviewed plaintiff's chart later that day and specifically approved giving plaintiff medication during the regular medication pass times. Even if Stecker did not pass along the information she learned from Bogseth, there is no evidence that Stecker knew that Kuber's decision not to give him narcotic medication during the night would pose an excessive risk of harm by unnecessarily prolonging plaintiff's pain or exacerbating his injury.

Finally, plaintiff argues that Nurse Stecker was deliberately indifferent by continuing his treatment plan for no narcotic pain medication on September 30, even though plaintiff reported that he was in pain. Plaintiff contends that Stecker should have called the on-call physician. However, plaintiff has failed to present any evidence apart from his own lay opinion that there is more that Stecker could or should have done to help him. In fact, when plaintiff saw a different nurse on October 2, that nurse contacted the on-call doctor, who determined that no new medication orders were needed. Accordingly, Stecker is entitled to summary judgment as to plaintiff's claims against her.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Dr.

Roethlisberger, Dr. Kuber, Dr. Hoffman, Candace Warner and Kim Stecker, dkt. #33, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 9th day of September, 2019.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge